IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| KENNETH PHILLIPS, <br><br> *Plaintiff* <br><br> v. <br><br> BALTIMORE POLICE DEPARTMENT, <br> MICHAEL HARRISON, <br> BRIAN NADEAU, and <br> RANA DELLAROCCO, <br><br><br> *Defendants.* | C.A. No: _____ <br><br> (Jury Trial Demanded) |

**COMPLAINT**

**INTRODUCTION**

1.      This is an action for money damages brought pursuant to 42 U.S.C §§ 1983 and 1985(3), and the First and Fourteenth Amendments to the United States Constitution, against the Baltimore Police Department ("BPD") in its capacity as a municipality, and Michael Harrison ("Harrison"), Brian Nadeau ("Nadeau"), and Rana DellaRocco ("DellaRocco"), in their individual capacities. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law.

2.      It is alleged that the individual Defendants, either independently, or while engaged in a conspiracy, retaliated against the Plaintiff for engaging in protected speech, namely, reporting matters of public concern to federal, state, and local regulatory and investigative bodies, and to the press. The Defendants' retaliation deprived the Plaintiff of rights guaranteed by the Constitution of the United States by weaponizing the investigative and disciplinary powers of BPD's Public Integrity Bureau ("PIB"). The way in which the

1

Defendants retaliated is consistent with a documented pattern and practice of retaliating against members of BPD that report misconduct and has a chilling effect on reporting similar violations.

3.    It is also alleged that BPD proximately caused the constitutional violations inflicted by Harrison, Nadeau, and DellaRocco because BPD maintains a policy, custom, or practice of retaliating against employees that file complaints to PIB that allege misconduct of other agency officials. For the purposes of this Complaint, the policy of retaliation stems from the actions of Deputy Commissioner Brian Nadeau, a final policymaker of BPD as it relates to conducting internal investigations, and of Commissioner Michael Harrison, who is a final policymaker of BPD as it relates to disciplining officers for findings made in PIB investigations. Further, this Complaint alleges that at the time Ken Phillips engaged in protected activity, BPD officers that had previously reported misconduct to PIB either experienced retaliation or feared that they would.

4.    Finally, it is alleged that both Harrison and Nadeau, who had reason to believe that Mr. Phillips was being retaliated against and who had the real and perceived authority to intervene and stop the retaliation, failed to do so.

**PARTIES**

5.    Kenneth Phillips ("the Plaintiff" or "Mr. Phillips") has been a public servant for forty-seven (47) years. He is a resident of Tennessee and of full age.  Prior to his employment at BPD, Mr. Phillips served as a sworn officer in Tennessee and worked for the Department of Defense as a forensic scientist, where he deployed to Afghanistan to process forensic evidence to support the war in Afghanistan. Plaintiff was employed by BPD for nearly five years as a Forensic Science Supervisor in BPD's Latent Print Unit. While in that role, he observed a pattern of mismanagement by leaders of BPD's Forensic Science Division relating

to the processing of latent print samples collected from crime scenes. By 2022, this mismanagement led Mr. Phillips to complain that there were as many as 26,000 unprocessed latent prints. Mr. Phillips made numerous complaints to state and city agencies and BPD's PIB relating to the mismanagement of the Forensic Science Division. He was terminated on April 15, 2022, after making those complaints and for speaking on the record for an article published by the Baltimore Sun.

6.      Defendant Baltimore Police Department is a municipal entity and an agency of the City of Baltimore, organized under the laws of the State of Maryland. Although nominally a state agency under Maryland law, the BPD operates as a municipal police force, and courts have recognized that it may be sued under 42 U.S.C. § 1983 for constitutional violations carried out by its officers or pursuant to its policies, practices, and customs. The BPD is responsible for establishing, implementing, and enforcing policies, procedures, and customs related to policing in Baltimore, and it acts under color of state law for purposes of § 1983. As such, the BPD is a "person" within the meaning of 42 U.S.C. § 1983 and may be held liable for violations of constitutional rights resulting from official policies, widespread customs or practices, and the deliberate indifference of policymakers.

7.      Defendant Michael Harrison, at all times relevant to this complaint, was the Commissioner of BPD.  In his capacity as Police Commissioner, Defendant Harrison oversaw all aspects of BPD including its efforts to comply with the Consent Decree. Integral to BPD's efforts to comply with the Consent Decree was the reformation of the Public Integrity Bureau and the Department of Justice's mandate that the Bureau implement policies to ensure that complaints of misconduct are investigated in a thorough, fair, impartial and timely manner. In his capacity as Commissioner, Defendant Harrison approved the proposed disciplinary sanctions for members of BPD whose investigations were sustained by PIB. In this case, his

decision to approve the termination of the Plaintiff was prejudicial to the Plaintiff's constitutionally protected rights and chilled the rights of others to report misconduct.

8.      Defendant Brian Nadeau, at all times relevant to this complaint, was a Deputy Commissioner of BPD and responsible for the reform and oversight of PIB. Deputy Commissioner Nadeau made decisions that directly impacted the investigations of the PIB complaints which are relevant to this case and those decisions were prejudicial to the Plaintiff's constitutionally protected rights.

9.      Defendant Rana DellaRocco, at all times relevant to this complaint, was either the Laboratory Director or Chief of BPD's Forensic Science and Laboratory Division. She had supervisory authority over the Plaintiff in both roles and was responsible for the management of BPD's Forensic Science Laboratory, which processes evidence collected from crime scenes and produces reports and opinions offered in state and federal courts. She is now the Chief of Forensic Science & Evidence Services Division of BPD.  Defendant DellaRocco made decisions that directly impacted the investigation of the Plaintiff's PIB complaints and retaliated against him in a manner that was prejudicial to the Plaintiff's constitutionally protected rights.

## RELEVANT BACKGROUND AND APPLICABLE BPD POLICIES

10.      BPD has a storied and notorious history of officer misconduct and unconstitutional policing practices.

11.      On April 7, 2017, the Baltimore Police Department, the Mayor and City Council of Baltimore, and the United States Department of Justice entered into a Consent Decree aimed at addressing a pattern and practice of unconstitutional policing that has plagued public safety efforts and harmed the citizens of Baltimore for decades. Central to the mandated reform of BPD was the premise that BPD must first effectively police itself through thorough, transparent

and fair internal investigations, while avoiding conflicts of interest in conducting those investigations.

12.    The Public Integrity Bureau is the bureau within BPD that is tasked with investigating allegations of misconduct by BPD and its members.

13.    As part of its efforts to comply with mandated reforms, PIB adopted the PIB Internal Operations and Training Manual ("the PIB Manual"). The PIB Manual is the codification of the carefully crafted reforms mandated by the Consent Decree. Its creation and adoption have been praised in testimony given before the Court overseeing the Consent Decree as a collaborative effort between the DOJ, the BPD, the Monitoring Team, and the public. It took two years to develop after having every word painstakingly reviewed. The PIB Manual was created with the specific intent of being a practical set of policies that would ensure every investigation is conducted comprehensively and concluded timely.

14.    The Manual provides that PIB investigations serve to ensure that all BPD members perform in a manner consistent with the expectations and policies of BPD, as well as local, state, and federal laws.[1]

15.    The Manual requires that PIB investigations are conducted with the highest degree of confidentiality and prohibits PIB personnel from disclosing or confirming to anyone outside of PIB that a complaint has been made, an investigation is being conducted, or the identity of complainants and/or witnesses.[2]

16.    The Manual requires PIB investigators to thoroughly conduct all investigations to completion, regardless of whether the accused member separates from BPD, and requires investigators to thoroughly explore and pursue all reasonable investigative leads.[3]

---

[1] Exhibit 1 - PIB Investigative and Training Manual, pp 53-54.
[2] Id.
[3] Id.

17.    The Manual requires investigators to locate every complainant and conduct an in-person interview.[4]

18.    The Manual requires investigators to contact every witness identified in the complaint or by the complainant, and where a witness is a BPD employee, the investigators are required to conduct a formal audio and video recorded interview.[5] Witnesses that are employees are required to submit to recorded interviews.[6]

19.    The Manual provides that only Deputy Commissioner Nadeau, or his designee, can make a final determination as to investigative findings.[7]

20.    The Manual was implemented after approval of the Court overseeing the Consent Decree in November of 2019.

21.    In response to BPD's long history of corruption and deep-seated mistrust by the public, in 2018 the Maryland General Assembly established the Commission to Restore Trust in Policing ("the Commission") in 2018.

22.    The Commission undertook a two-year investigation into the Baltimore Police Department, which included conducting surveys and interviews of current and former members of BPD, in order to study the issue of corruption and enact meaningful reform.

23.    On December 2, 2020, the Commission published its findings in a report submitted to Governor Hogan, the Maryland Senate, and the House of Delegates. The report noted, in part, results from a survey of 2,800 active, sworn members of BPD that was conducted from August 11, 2020, through September 10, 2020.  The responses captured the experience of officers that had observed and reported misconduct. The results were shocking, and the Commission reported:

---

[4] Exhibit 2 - PIB Investigative and Training Manual, pp 65-66.
[5] Exhibit 3 - PIB Investigative and Training Manual, pp 71-73
[6] Exhibit 4 - PIB Investigative and Training Manual, pp 78-79
[7] Exhibit 5 - PIB Investigative and Training Manual, pp 121-123

"When those who reported were asked if they felt the matter was handled properly, about 69% said no. Some respondents expressed frustration that "nothing happened" to the officer they reported. Others criticized the quality or efficiency of the investigation conducted by Internal Affairs.

The information obtained by the Commission indicates that fear of retaliation is a powerful disincentive for reporting misconduct in the BPD. More than half of the officers who did report misconduct (about 56%) felt that they suffered negative consequences as a result. The overwhelming majority of survey respondents said they would report corruption if they observed in the future, but many added that they would feel uncomfortable doing so unless they could report anonymously, out of fear that they would otherwise be subjected to retaliation or labeled a "rat" or a "snitch." As one respondent put it, the BPD instills fear that if you "snitch," you could ruin your career; the reporting officer gets a reputation for being untrustworthy, while the offending officer goes unpunished.

Several respondents who reported misconduct in the past said they would not do so again based on the retaliation they had suffered. In just one example, an officer reported that after he filed a complaint against a member of his squad for overtime fraud, the offending officer filed a retaliatory complaint against him and other squad members in response. At the time of the survey, both complaints were still under investigation by Internal Affairs, and the officer who reported the overtime fraud had been removed from his squad pending resolution of the offending officer's complaint. He said that if he had known that reporting the fraud would derail his own career, he never would have made the report." [8]

24.    The survey revealed that during the exact period of the facts alleged in this Complaint, individuals that reported misconduct to PIB were justified in fearing, and in fact experienced, retaliation because of their complaints.

25.    On information and belief, Deputy Commissioner Nadeau does not require PIB investigators to follow the protocols set forth in the PIB Investigative and Training Manual.

26.    On information and belief, at the time of case intake, Deputy Commissioner Nadeau orders PIB investigators to tailor their investigations and recommend preordained findings that are consistent with his desired outcomes, specifically in "Red Ball" cases.

27.    On information and belief, Deputy Commissioner Nadeau orders PIB investigators to evaluate cases at a standard below a preponderance of evidence in order to reach his preordained recommendations.

---

[8] Exhibit 6 - Commission to Restore Trust in Policing Report, pp 105-107 December 2020.

28.     On information and belief, Deputy Commissioner Nadeau coerces and intimidates hearing officers assigned to the Office of Administrative Hearings ("OAH") to ensure that OAH recommends disciplining respondents consistent with his pre-determined desires.

29.     On information and belief, Commissioner Harrison was aware of, and endorsed, Deputy Commissioner Nadeau's tactics described above.

### FACTS

30.     On September 18, 2017, Mr. Phillips began working as a Forensic Science Supervisor in BPD's Latent Print Unit. He reported directly to Deputy Director Ethan Conway and was responsible for supervising forensic scientists assigned to the Latent Print Unit.

31.     In the winter of 2019, Mr. Phillips was given a special assignment to process a soda bottle found at the scene of a homicide that had not been fully processed for latent prints. The case garnered media attention and had been prioritized by BPD leadership.  To potentially identify the homicide suspect, Mr. Phillips directed that the bottle be further processed with super glue fuming, a commonly used technique for developing latent prints on non-porous surfaces. The forensic methodology that Mr. Phillips used is an approved methodology by state and federal forensic accrediting bodies but was not one that BPD typically used.

32.     As a result of Mr. Phillips's analysis, a suspect was identified and charged.

33.     On March 7, 2019, Mr. Phillips was summoned to a meeting by Director DellaRocco wherein she chastised Mr. Phillips for not "respecting the expertise" of the forensic scientist, Dana Keiter, who was processing the evidence in the homicide case.  This criticism came despite Deputy Director Ethan Conway, Mr. Phillips' direct supervisor, ordering Mr. Phillips to assist in the processing of evidence because he was afraid that Ms. Keiter would "screw it up."  Ms. Keiter's direct supervisor, Jennifer Bresett, also requested Mr. Phillips's

assistance in processing the evidence. During that meeting, Director DellaRocco banged on the table and repeatedly stated that "no more Afghan people" should work for the lab.

34.    On March 8, 2019, Mr. Phillips was approached by a subordinate examiner, Laura Tierney, who reported that she discovered an apparent violation of state regulations related to the experience level of a member of the BPD Forensic Screening Unit, Dana Keiter, to be Technical Leader in the sub-discipline of latent print processing (using chemical reagents and light sources to produce finger and palm prints on items of evidence related to crimes). Ms. Keiter is trained in the forensic subdiscipline of serology and had little to no training, and very limited experience, in the subdiscipline of latent print processing.

35.    A Technical Leader of a forensic discipline or subdiscipline is required to have training and experience sufficient to be able to provide technical guidance to junior members of the unit. To ensure that expertise, the Code of Maryland Regulations (COMAR) requires that the Technical Leader have a specified number of years of experience in the forensic subdiscipline for which they are to provide technical leadership. Ms. Keiter fell short of the required experience by approximately six months at the time the violation was discovered by Ms. Tierney and had been working as the Technical Leader well before that. Laura Tierney also discovered that Dana Keiter had signed off on the validation of fingerprint reagents before she met the experience requirements mandated by the COMAR regulations.[9]

36.    Director DellaRocco appointed Dana Keiter to be the Technical Leader of the Latent Print Unit despite her lack of experience and training.

37.    On March 14, 2019, Mr. Phillips filed a formal grievance with Laboratory Chief Steve O'Dell that complained about Director DellaRocco's use of discriminatory and offensive language ("no more Afghan people") at the March 7th meeting.

---

[9] Exhibit 7 - COMAR 10.51.06.12

38.     That same day, Mr. Phillips complained in person to Chief O'Dell and Director Kendall Jaeger about the COMAR violation relating to the appointment of an unqualified Technical Leader. Chief O'Dell attempted to minimize the COMAR violation and discouraged Mr. Phillips from making a formal complaint to the Department of Health.

39.     Mr. Phillips believed that a violation of Maryland law relating to the designation of a Technical Leader could risk the accreditation and licensing of BPD's forensic laboratory and potentially result in the lab being closed.[10] Mr. Phillips felt that the risk of that sanction was a matter of public importance, as the lab is funded by taxpayer dollars to perform a critical public safety role for the citizens of Baltimore.

40.     In April of 2019, Mr. Phillips reported the violation to the Department of Health.

41.     After receiving the Plaintiff's complaint, Dr. Tia Tate of the Maryland Department of Health called Mr. Phillips. During that conversation, Dr. Tate asked Mr. Phillips "[s]o what do you want us to do about this?" Mr. Phillips was confused by the question and answered that he was fulfilling his obligation to report the violation.

42.     After the call with Dr. Tate, Mr. Phillips was summoned to a meeting with Director DellaRocco, wherein she rhetorically asked him, "[w]ho do you think helped write those regulations?" The Plaintiff felt threatened by Director DellaRocco's reference to his complaint to the Department of Health, as that statement indicated to him that Director DellaRocco had connections in the state regulating body and that his complaint had been improperly leaked to her.

43.     On information and belief, the Department of Health did not investigate Mr. Phillips' complaint, and no corrective action was recommended or taken.

44.     After Mr. Phillips submitted his complaint to the Department of Health, he was retaliated against by both Director DellaRocco and Deputy Director Conway. These acts

---

[10] See Exhibit 8 - MD HEALTH GEN § 17-2A-09, and Exhibit 9 - COMAR 10.56.07.01

included Director DellaRocco spreading rumors about Mr. Phillips to personnel throughout the laboratory; Mr. Phillips being denied information he needed to be effective at his job; and numerous hostile interactions with Director DellaRocco and Deputy Director Conway.

45.     Beginning in December of 2019, and continuing every six months thereafter, Mr. Phillips received substandard Civilian Employee Performance Evaluations. These evaluations were the only negative reviews Mr. Phillips received in his more than forty-year career in law enforcement and immediately followed his reporting of misconduct. Additionally, the evaluations, completed by Deputy Director Conway, departed dramatically in form and substance from the requirements of BPD Policy 1722 which governs the procedure and requirements of Civilian Employee Performance Evaluations.

46.     On January 2, 2020, Mr. Phillips filed a comprehensive, written complaint to the Office of Inspector General for Baltimore City, the Baltimore City Department of Human Resources, BPD Deputy Commissioner James Gillis, and Commissioner Michael Harrison. The 75-page complaint was multi-part and included the substance of Mr. Phillips's prior grievance against DellaRocco and his complaint to the Department of Health.[11]

47.     The complaint also alleged that BPD's forensic laboratory had amassed a massive backlog of unworked cases in the forensic laboratory; potentially as many as 26,000 cases. Mr. Phillips continued to suggest that this massive backlog amounted to waste, fraud, and abuse, stating:

> "It is also a waste of public funds. The costs in labor and materials, of police personnel to collect that evidence wasted substantial public funds because the laboratory knows that those efforts, which occur on a large scale over time, are being made to collect evidence that will never be analyzed."

---

[11] Exhibit 10 - Complaint to OIG, DHR, Commissioner Harrison and Deputy Commissioner Gillis.

48.     Mr. Phillips also alleged that Deputy Director Conway asked the lab's Informational Technology contractor, David Kan, whether he could delete cases in the backlog that were more than two years old. Mr. Phillips alleged that Conway's suggestion, if followed, would amount to a violation of Maryland's public records laws, and potentially expose BPD to further sanctions.

49.     Mr. Phillips' complaint also highlighted numerous examples of retaliation by Director DellaRocco and Deputy Director Conway after his filing of grievances and complaints and included allegations of disparate treatment and discipline of African American employees compared to white employees by Director DellaRocco and Deputy Director Conway.

50.     Specifically, in the Summer or Fall of 2019, a probationary African American employee of the Latent Print Unit was terminated for making an erroneous identification of a fingerprint in a case. Yet, a white female employee had been hired with the same error in her background from another police agency.  Furthermore, another probationary employee, who was white and who was training to be a latent print examiner, was recommended for removal from the training program by her trainer, Laura Tierney, and Mr. Phillips, her supervisor, for an ongoing pattern of violating BPD policies. Neither Director DellaRocco nor Deputy Director Conway disciplined this individual. Mr. Phillips reported another white employee that said he wanted to "punch Ethan (Conway) in the throat". This incident constituted insubordination and a violation of the City of Baltimore's Workplace Violence Policy. Neither Director DellaRocco nor Deputy Director Conway disciplined this employee.

51.     On or about January 5, 2020, Renata Fields of the Office of Inspector General for Baltimore City declined to investigate the case and stated that it had instead been referred to Police Commissioner Harrison.

52.     Neither Commissioner Harrison nor Deputy Commissioner Gillis contacted Mr. Phillips about his complaint.

53.     On information and belief, neither Commissioner Harrison nor Deputy Commissioner Gillis forwarded the complaint to PIB for investigation.  Their failure to report the complaint of misconduct is a violation of Policy 302.[12]

54.     In or around April of 2020, Mr. Phillips filed a complaint with the EEOC because of Ms. DellaRocco's statement about "no more Afghan people."

55.     On June 16, 2020, Mr. Phillips filed the same 75-page complaint that he filed in January to the OIG and DHR with PIB Detective Seargent Anthony Faulk. The case was eventually assigned to PIB Detective Derek Collins.

56.     On information and belief and unbeknownst to Mr. Phillips at that time, Detective Seargent Anthony Faulk was in a romantic, cohabitating relationship with a member of the DNA Unit in BPD's Laboratory. Prior to being promoted to Director, Ms. DellaRocco worked in the DNA Unit.

57.     On information and belief, Detective Seargent Anthony Faulk broke confidentiality and Mr. Phillips' PIB complaint was revealed to Director DellaRocco.

58.     On June 22, 2020, Director DellaRocco submitted a PIB complaint against Mr. Phillips, alleging sex-based discrimination under a vague theory of "contra-power harassment."

59.     On information and belief, DellaRocco's complaint was baseless and retaliatory, as Mr. Phillips had been a champion for the advancement of women in policing and forensic science for his entire career.

60.     On July 20, 2020, Mr. Phillips emailed PIB Detective Derek Collins evidence of retaliation he was experiencing as a result of his complaining internally about the backlog in the Latent Print Unit. His email went unanswered.

---

[12] Exhibit 11 - BPD Policy 302.

61.     In September of 2020, PIB Detective Enrique Villareal served Mr. Phillips with notice that he was a respondent in a "discrimination by sex" complaint made by Director DellaRocco.

62.     In stark contrast to the complaints filed by Mr. Phillips, which had not been investigated, PIB immediately began an investigation of Director DellaRocco's complaint against Mr. Phillips.  Mr. Phillips still had not been interviewed in reference to the PIB complaint he filed months earlier.

63.     On March 14, 2021, Mr. Phillips submitted a complaint to the Equal Opportunity and Diversity Section ("EODS"), which falls under the PIB, alleging race-based discrimination by Director DellaRocco and Deputy Director Conway in the discipline of subordinate lab personnel.

64.     In late April of 2021, Mr. Phillips was called into Director DellaRocco's office wherein she gleefully informed him that another PIB complaint was lodged against him, this one related to his use of "COVID Permission Leave."

65.     On information and belief, this complaint was also baseless and retaliatory as Mr. Phillips had consulted with BPD's COVID Preparation Unit every time he used the leave in order to ensure his compliance with policy.

66.     On May 24, 2021, after still never being interviewed as a complainant in his PIB case, Mr. Phillips emailed Deputy Commissioner Brian Nadeau. The email outlined the retaliation he was facing because of his prior complaints. The email also discussed the allegations contained in his PIB complaint that he filed in June of 2020.

67.     Just one day later, on May 25, 2021, the current version of BPD's Anti-Retaliation Policy, Policy 1729, was published.  That policy provides:

> "One important manner in which BPD promotes ethics and integrity is by mandating that all BPD members have an Affirmative Duty to report violations of law or BPD policy committed by other BPD members of any rank. Similarly, BPD mandates members to intervene to prevent or stop Misconduct. As an essential counterpart to this

Affirmative Duty to report misconduct and to intervene to prevent or stop Misconduct, BPD strictly prohibits Retaliation against or interference with a BPD member or any member of the public for any reason, to include those who report or seek to report violations of law or BPD policy, or who intervene, or seek to intervene to prevent or stop Misconduct. BPD is committed to protecting its members and the public to ensure that they are not subjected to, nor subject others to, acts of Retaliation.

Policy 1701, *Equal Employment Opportunity and Diversity Policy,* prohibits Retaliation for making a Complaint of harassment or discrimination, participating in the investigation of such a Complaint, or otherwise opposing harassment or discrimination at work." [13]

68.     On June 3, 2021, Mr. Phillips copied Deputy Commissioner Nadeau on an email to Deputy Commissioner Gillis and Captain Anthony Smith wherein he warned them that any reports to BPD leadership indicating that there was no backlog in the Latent Print Unit were false. He stated that, even setting aside write-offs, there were hundreds of cases of car jackings and armed robberies dating back to 2014 that had not been analyzed.

69.     On June 11, 2021, Mr. Phillips copied Deputy Commissioner Nadeau on an email he sent to Deputy Director Conway wherein he challenged Conway's performance ratings in his Civilian Employee Evaluation.  The inclusion of Deputy Commissioner Nadeau was to ensure that he was aware of the retaliation Mr. Phillips was facing for his filing of complaints about the lab.  With certain knowledge of the retaliatory acts and despite his duty to prevent same, Deputy Commissioner Nadeau did nothing to stop the retaliation.

70.     On or about June 16, 2021, one year after he filed his complaint with PIB, Mr. Phillips had a meeting with Deputy Commissioner Nadeau. Mr. Phillips asked why he was never interviewed as a complainant and why the investigation was not complete. Deputy Commissioner Nadeau offered no reasonable explanation regarding the delay, and Mr. Phillips determined that nothing had been done.

71.     After more than two years of raising alarms about the management of BPD's Forensic Science Division, and numerous complaints of retaliation, discrimination, waste,

---

[13] See Exhibit 12 - BPD Policy 1729.

fraud and abuse, violation of Department of Health regulations, and crippling backlogs, Mr. Phillips determined that BPD was intent on sweeping his concerns under the rug. Not even one of his complaints had been investigated by BPD, and instead, he was subjected to retaliation in the form of frivolous complaints and negative performance evaluations.

72.     On June 30, 2021, Mr. Phillips sent an email to BPD's Media Relations Section and copied Deputy Commissioner Nadeau, Deputy Commissioner Gillis and Commissioner Michael Harrison. The email indicated his intent to go to the media and report aspects of his June 16, 2020, PIB complaint that were of public concern. Prior to taking any action, Mr. Phillips reviewed BPD Policy 602 to ensure that any disclosure he planned to make was permitted by the policy and limited to matters of public interest.[14]

73.     On July 21, 2021, BPD suspended Mr. Phillips and issued administrative charges against him because of the two PIB cases that were lodged against him. Both complaints were filed after, and in retaliation for, his June 16, 2020, PIB complaint.

74.     On August 11, 2021, The Baltimore Sun published an article about Mr. Phillips' allegations. Quoting Mr. Phillips, the article described BPD's collection of fingerprint evidence as "theater" designed to appease and mislead the public. The article further explained that the backlog of untested fingerprint evidence had exploded over the past decade and the Department was concealing the problem while failing to conduct any meaningful fingerprint analysis on non-violent felony investigations and property crimes.[15]

75.     On December 6, 2021, Mr. Phillips filed a complaint with the EEOC that alleged disparate treatment of employees assigned to the Forensic Science Division on the basis of race. His complaint was assigned EEOC case number 531-2022-00711.

---

[14] Exhibit 13 - BPD Policy 602.
[15] Exhibit 14 - Baltimore Sun Article.

76.     In early 2022, a trial board of one, Deputy Commissioner Michael Sullivan, conducted a termination hearing for Mr. Phillips.  In advance of the hearing, Mr. Phillips was deprived of access to the taped statement of his accuser, Director DellaRocco.  After receiving a corrupted file purporting to be the taped statement, Mr. Phillips informed Deputy Commissioner Nadeau that he did not have a playable version of the statement.  Defendant Nadeau failed to even respond to Mr. Phillips.  Meanwhile, Deputy Commissioner Sullivan recommended termination without explaining how Mr. Phillips could have discriminated *up* the chain of command (Director DellaRocco was two-levels superior to his position) or how termination would be appropriate when there was no record of progressive discipline for the underlying allegation, nor any disciplinary history whatsoever contained in Mr. Phillips's personnel records.  Deputy Commissioner Sullivan did not even explain what "contrapower harassment" was nor did he receive evidence to support the allegation or even identify what BPD policy was violated by the allegations.

77.     On April 1, 2022, having heard nothing from PIB relating to his complaint and having never been interviewed as a complainant, Mr. Phillips sent an email to Baltimore City Mayor Brandon Scott. The email reported the growing backlog of cases in the Latent Print Unit and described how those cases were being written off by the lab's leadership. Mr. Phillips also described how he was being retaliated against and requested assistance from Mayor Scott prior to his termination hearing. Though Mayor Scott acknowledged Mr. Phillips's email, he did not intervene.

78.     On April 15, 2022, BPD terminated Mr. Phillips. The termination came at the recommendation of Deputy Commissioner Brian Nadeau and was approved by Commissioner Michael Harrison.

79.     On information and belief, the complaint that Mr. Phillips filed with PIB on June 16, 2020, was never investigated.

80.     The complainants that lodged the retaliatory PIB complaints against Mr. Phillips, and the witnesses that were called to corroborate those complaints during the administrative trial board, <u>have all been promoted</u>.

81.     On information and belief, at all times during the events described above, the Defendants were engaged in a joint venture. Commissioner Harrison, Deputy Commissioner Nadeau, and Director DellaRocco assisted each other in retaliating against the Plaintiff after he engaged in protected activity and lent their support and the authority of their office to each other to do so.

82.     As a direct and proximate result of the acts of the defendants described herein, the Plaintiff suffered the following injuries and damages;

    a.  Violation of his rights guaranteed by the First Amendment to the United States Constitution;

    b.  Violation of his Due Process rights under the Fourteenth Amendment to the United States Constitution;

    c.  Emotional distress;

    d.  Economic loss in the form of lost wages, retirement benefits, and professional opportunities;

    e.  Damage to his career and reputation.

**CLAIMS FOR RELIEF**

**COUNT I**
**42 U.S.C. § 1983 Against BPD**

83.     Paragraphs 1 through 82 are incorporated herein by reference as though fully set forth.

84.    At all times relevant to this complaint, the Baltimore Police Department maintained policies or customs exhibiting deliberate indifference to the constitutional rights of and protections for individuals who reported misconduct.

85.    Deputy Commissioner Nadeau, designated as a final policy maker through his inherent position of authority as well as the BPD policies that designate him as the final authority in making investigative findings, routinely interfered with and/or halted investigations and solicited, encouraged, and demanded acts of retaliation by his subordinates against individuals who reported misconduct.

86.    Commissioner Michael Harrison, designated as a final policy maker through his inherent position of authority as well as BPD policies that designate him as the final authority for discipline resulting from misconduct investigations, endorsed acts of retaliation by his subordinates against individuals who reported misconduct.

87.    Clear evidence of this policy of retaliation as well as a policy of failing to adequately investigate complaints in a fair, neutral, and thorough manner is established by the Consent Decree itself, the findings of the Commission to Restore Trust in Policing, and the actions described herein.

88.    The above-described policies and customs demonstrated a deliberate indifference on the part of the policymakers of the Baltimore Police Department to the constitutional rights of members of BPD who report misconduct and were the cause of the violations of the Plaintiff's rights alleged herein.

89.    As a direct and proximate result of BPD's actions the Plaintiff was deprived of rights guaranteed to him by the First and Fourteenth Amendments of the Constitution of the United States and has suffered and continue to suffer other damages as described herein.

## COUNT II
### 42 U.S.C. § 1983 Against Individual Defendants

90.    Paragraphs 1 through 89 are incorporated herein by reference as though fully set forth.

91.    The conduct of the individual Defendants described herein was intended to deprive the Plaintiff of rights guaranteed under the First and Fourteenth Amendments to the United States Constitution.

92.    The conduct undertaken by the individual Defendants described herein was under color of law, custom and usage and by the authority given to them by state law in their capacity as officers and agents of the BPD and was in violation of 42 U.S.C. § 1983.

93.    As a direct and proximate result of the Defendants' retaliatory actions the Plaintiff was deprived of rights guaranteed to him by the First and Fourteenth Amendments to the United States Constitution and has suffered and continues to suffer other damages as described herein.

## COUNT III
### 42 U.S.C. § 1985 Against Individual Defendants

94.    Paragraphs 1 through 93 are incorporated herein by reference as though fully set forth.

95.    The above-named Defendants did conspire for the purposes of depriving, either directly or indirectly, the Plaintiff of rights guaranteed under the First and Fourteenth Amendments to the United States Constitution.

96.    The acts described herein were undertaken in furtherance of the conspiracy.

97.    As a direct and proximate result of the Defendants' retaliatory actions the Plaintiff was deprived of rights guaranteed to him by First and Fourteenth Amendments to the United States Constitution and has suffered and continues to suffer other damages as described herein.

**WHEREFORE**, the Plaintiff claims:

1.  Compensatory damages to include backpay with interest;

2.  Special damages to include emotional distress and reputational harm;

3.  Punitive damages;

4.  Damages and attorneys' fees under 42 USC §§ 1983 and 1985; and

5.  Such other relief as law or equity permits.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on all triable issues of fact raised by this Complaint.

Respectfully submitted
THE PLAINTIFF,


By */s/ Michael Turiello*
Michael Turiello, Esq. (30383)
Skeen Law Offices
258 E. High Street
Charlottesville, VA 22902
mturiello@skeenlaw.com

Patrick Jennings, Esq. (30362)
Ment Law Group
225 Asylum Street – 15th Floor
Hartford, CT 06103
pjennings@mentlaw.com