IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KENNETH PHILLIPS,                    *

    Plaintiff,                         *

v.                                   *        Civil Action No. GLR-25-1231

BALTIMORE POLICE                     *
DEPARTMENT, et. al.,
                                     *
    Defendants.

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Baltimore Police Department ("BPD"), Michael Harrison, Brian Nadeau, and Rana DellaRocco's ("Defendants") Motion to Dismiss (ECF No. 18). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2025). For the reasons outlined below, the Court will grant the Motion in part and deny it in part.

## I.    BACKGROUND

### A.    Factual Background[1]

In 2017, due to "officer misconduct and unconstitutional policing practices," (Compl. ¶ 10, ECF No. 1), BPD, the Mayor and City Council of Baltimore, and the U.S. Department of Justice entered the "Consent Decree," to reform BPD through "thorough, transparent and fair internal investigations." (Id. ¶¶ 10–11). BPD created The Public

---

[1] Unless otherwise noted, the following facts are taken from the Complaint (ECF No. 1) and accepted as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Integrity Bureau ("PIB") to "investigat[e] allegations of misconduct" within the Department. (Id. ¶ 12).

Plaintiff Kenneth Phillips has forty-seven years of experience as a public servant and worked as a forensic scientist in law enforcement and the military. (Id. ¶ 5). In 2017, Phillips began working at BPD as a Forensic Science Supervisor in the Latent Print Unit. (Id. ¶ 30). In early 2019, Phillips began to suspect that leadership in the unit was not complying with the Code of Maryland Regulations ("COMAR"). (Id. ¶¶ 33–36). Another employee in the unit informed Phillips that she had discovered an apparent COMAR violation because the Technical Leader in the Latent Print unit did not have the training or experience in the subdiscipline required by the COMAR. (Id. ¶¶ 34–35). Phillips believed that this noncompliance with COMAR could result in the lab losing accreditation and licensing, and ultimately, closure of the lab. (Id. ¶ 39).

On March 14, 2019, Phillips made his first complaints about alleged compliance issues in the Forensic Unit. (Id. ¶¶ 37–38). Phillips initially complained in person about the apparent COMAR violation relating to an unqualified Technical Leader to Laboratory Chief Steve O'Dell and Director Jaeger, but O'Dell attempted to minimize these issues and discouraged Phillips from making an outside complaint. (Id. ¶ 38).

In April of 2019, Phillips reported the apparent COMAR violation to the Maryland Department of Health ("MDH"). (Id. ¶ 40). An employee from MDH called Phillips about the complaint, allegedly asking him, "so what do you want us to do about this?" (Id. ¶ 41). Soon thereafter, Director DellaRocco summoned Phillips and rhetorically asked him, "who do you think helped write those regulations?" (Id. ¶ 42). In Phillips' view, this was a

reference to the complaint he had made with MDH, and he believed that his complaint had been improperly leaked to her. (Id.). Phillips alleges that following his meeting with DellaRocco, she and Deputy Director Conway began retaliating against him. (Id. ¶ 44). He alleges that this retaliation included the spreading of rumors, being denied information necessary to perform his job duties, and numerous hostile interactions. (Id.).

On January 2, 2020, Phillips filed a 75-page report with the Office of the Inspector General ("OIG") for Baltimore City, the Baltimore City Department of Human Resources, BPD Deputy Commissioner Gillis, and Defendant BPD Commissioner Harrison. (Id. ¶ 46). In this report, he detailed the prior grievance with DellaRocco, the report he previously made with MDH, and the alleged retaliation he was facing. (Id. ¶¶ 46–49; see also Pl.'s OIG Report ["OIG Report"], ECF No. 1-10).[2] Phillips also alleged that BPD's forensic laboratory amassed a massive backlog of potentially up to 26,000 unworked cases, something he suggested was tantamount to waste, fraud, and abuse. (Compl. ¶ 47). Phillips further reported that Conway asked the lab's IT contractor if he could delete cases in the backlog that were more than two years old, which would have violated Maryland's public record laws and exposed BPD to legal consequences. (Id. ¶ 48). A few days later, on or

---

[2] "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 606 (4th Cir. 2015) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011)); see also Goines v. Valley Cmty Servs Bd., 822 F.3d 159, 166 (4th Cir. 2016) (in deciding a motion to dismiss, courts may "consider documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits") (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Fed.R.Civ.P. 10(c)).

about January 5, 2020, the OIG for Baltimore City notified Phillip that they declined to investigate the case and instead referred it to Harrison. (Id. ¶ 51). Phillips alleges that neither Harrison nor Gillis ever contacted him about the OIG report and never forwarded it to PIB for investigation (Id. ¶¶ 52–53).

On June 16, 2020, Phillips filed the same 75-page report with PIB Detective Sergeant Faulk. (Id. ¶ 55). Phillips alleges that unbeknownst to him at the time, Faulk was in a romantic, cohabitating relationship with a member of the DNA unit in BPD's laboratory – the same unit that DellaRocco had worked in prior to her promotion. (Id. ¶ 56). Phillips alleges that Faulk broke confidentiality and improperly revealed Phillips' complaint to DellaRocco. (Id. ¶ 57; see also PIB Invest. Manual at 2–3, ECF No. 1-1).[3]

On June 22, 2020, DellaRocco submitted a PIB complaint against Phillips, alleging sex-based discrimination. (Compl. ¶ 58). Phillips maintains that these allegations are baseless and retaliatory. (Id. ¶ 59). PIB immediately began investigating DellaRocco's complaint, and in September 2020, PIB served Phillips with notice that he was a respondent in a "discrimination by sex" complaint by DellaRocco. (Id. ¶¶ 61–62).

On March 14, 2021, Phillips filed another complaint with the Equal Opportunity and Diversity Section ("EODS") in BPD, alleging that DellaRocco and Conway discriminated against other BPD employees on the basis of race in disciplining personnel. (Id. ¶ 63).

---

[3] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Files ("CM/ECF") system.

On April 11, 2021, Phillips sent a letter to Baltimore Mayor Brandon Scott about the lab's backlog, stating: "I believe the citizens' right to know about serious mismanagement and waste of public funds outweighs any supposed interest the BPD may have in keeping these matters confidential." (Baltimore Sun Article at 5, ECF No. 1-14).[4]

In late April of 2021, DellaRocco again called Phillips into her office to inform him that he was the subject of another PIB complaint, related to his use of COVID Permission Leave. (Compl. ¶ 64). Phillips alleges that this PIB complaint was also baseless and retaliatory. (Id. ¶ 65). On May 24, 2021, Phillips emailed Nadeau about the retaliation he faced and the PIB report he filed in June 2020. (Id. ¶ 66).

On June 3, 2021, Phillips emailed Nadeau, Gillis, and Captain Anthony Smith about the lab backlog, informing them that there were hundreds of cases dating back to 2014 that had not been analyzed. (Id. ¶ 68). On June 11, 2021, Phillips copied Nadeau on an email to Conway about his allegedly retaliatory and improper Civilian Employee Evaluations so that Nadeau would be aware of this retaliation. (Id. ¶ 69). Soon thereafter, on or about June 16, 2021, Phillips met with Nadeau to discuss his June 2020 PIB report, wherein Nadeau offered "no reasonable explanation" for the lack of investigation. (Id. ¶ 70).

On June 30, 2021, having determined that further reporting within BPD would be futile, Phillips emailed BPD's Media Relations Team, Nadeau, Harrison, and Gillis,

---

[4] Though not referenced in the Complaint, the Baltimore Sun article attached to the Complaint referenced this event. (See ECF No. 1-14). It is not explicitly clear that this was sent in 2021, however, the Baltimore Sun article, updated on August 16, 2021, states that "Phillips told [Mayor] Scott [the above referenced quote] in an April 11 letter," (id. at 5), leading to an inference that this letter was sent in April 2021 and is separate from the April 2022 letter to Mayor Scott.

informing them that he intended to go to the media on matters of "public concern" within his June 2020 PIB complaint. (Id. ¶¶ 71–72). Prior to going to the media, Phillips alleges that he reviewed BPD policies to "ensure that any disclosure he planned to make was permitted by the policy and limited to matters of public interest." (Id. ¶ 72).

On July 21, 2021, BPD suspended Phillips and issued administrative charges against him for the two PIB cases that had been filed against him. (Id. ¶ 73). On August 11, 2021, the Baltimore Sun published an article about Phillips' allegations, naming and quoting him throughout the article. (Id. ¶ 74; Baltimore Sun Article at 3–5).

In early 2022, PIB held Phillips' termination hearing. (Compl. ¶ 76). Phillips alleges that this hearing was improperly held, that he had no access to his accuser's statement, that questions about the charges went unanswered, and that he was not told why termination was appropriate with no record of progressive discipline or disciplinary history. (Id.). On April 1, 2022, Phillips again reached out to Baltimore Mayor Scott, repeating his allegations of misconduct and the backlog in BPD's lab, and requesting assistance with his termination hearing. (Id. ¶ 77). Mayor Scott did acknowledge this email, but did not intervene in Phillips' termination. (Id.).

On April 15, 2022, BPD terminated Phillips. (Id. ¶ 78). This termination allegedly came at the recommendation of Defendant Deputy Commissioner Nadeau and the approval of Defendant Commissioner Harrison. (Id.).

## B.    Procedural History

Phillips initiated this action against Defendants on April 14, 2025. (ECF No. 1). He alleges that BPD and the individually named defendants unlawfully retaliated against him

for engaging in speech protected under the First Amendment. (Id. ¶¶ 1–2). Phillips seeks

monetary damages and attorney's fees. (Id. at 21). His Complaint alleges violations of his

First and Fourteenth Amendment rights under 42 U.S.C. § 1983 by Baltimore Police

Department (Count I); violations of his First and Fourteenth Amendment rights under 42

U.S.C. § 1983 by individual Defendants Harrison, Nadeau, and DellaRocco (Count II); and

conspiracy to violate his First and Fourteenth Amendment rights under 42 U.S.C. § 1985

by individual Defendants Harrison, Nadeau, and DellaRocco (Count III). (Compl. ¶¶ 83–

97).

On June 30, 2025, Defendants filed the instant Motion to Dismiss (ECF No. 18).

Phillips filed his Opposition on August 8, 2025 (ECF No. 21). In Phillips' Opposition, he

conceded all claims against DellaRocco; all conspiracy claims under 42 U.S.C. § 1985;

and all Fourteenth Amendment claims. (Pl.'s Resp. Opp'n ["Opp'n"] at 3, ECF No. 21).

Thus, the only remaining claims are Count I: 42 U.S.C. § 1983 Monell claim against

BPD for violations of Phillips' First Amendment rights; and Count II: 42 U.S.C. § 1983

against individual Defendants Harrison and Nadeau for violations of Phillips' First

Amendment rights. (Id.). Defendants filed their Reply on September 16, 2025 (ECF No.

22).

## II.    DISCUSSION

## A.    **Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint,"

not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of

defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City

of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

**B.**     <u>Analysis</u>

**1.**     **Statute of Limitations**

As a threshold matter, the Court first addresses Defendants' argument that Phillips' claims are time-barred. (Mem. L. Supp. Mot. Dismiss ["Mot."] at 8–10, ECF No. 18-1). There is no statute of limitations contained in 42 U.S.C. § 1983, so "'to determine the timely filing of a [Section] 1983 claim, courts borrow the statute of limitations from the most analogous state-law cause of action,' which is a personal injury lawsuit." (<u>Id.</u> at 8) (quoting <u>Owens v. Baltimore City State's Att'ys Off.</u>, 767 F.3d 379, 388 (4th Cir. 2014)). The Maryland statute of limitations for personal injury lawsuits is three years, and both parties agree that is the applicable standard here. (Mot. at 8; Opp'n at 4).

Here, Phillips alleges retaliatory conduct beginning in 2019, culminating in his termination on April 15, 2022. (Compl. ¶¶ 30–78). Phillips filed his Complaint on April 14, 2025, just one day shy of the three-year limitation. (<u>See</u> ECF No. 1). This termination, that Phillips alleges to be wrongful and retaliatory, is therefore not time barred.[5]

Events that occurred prior to April 14, 2022, are time-barred to the extent that they could be brought as their own separate causes of action. <u>See</u> <u>Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.</u>, No. TDC-18-3821, 2019 WL 2929025, at *9 (D.Md. July 8, 2019) (granting dismissal of a "discrete act" that was time-barred but denying dismissal on lawsuit as a whole). This does not mean, however, that they lack relevance in this case. <u>See</u> <u>id.</u> ("The Court also notes that the facts surrounding [Plaintiff]'s [time-barred]

---

[5] Defendants also recognize that this event is actionable. (Mot. at 8–9; Reply at 2–3, ECF No. 22).

suspension remain relevant for purposes of proving [his] other claims that are not time-barred."); see also Jordan v. Ector Cnty., 516 F.3d 290, 300–01 (5th Cir. 2008) ("While Defendants made much of the length of time between [protected activities] and [Plaintiff]'s termination, they fail to understand that the First Amendment can protect against distant retaliation; setting aside statute of limitations issues, the length of time is probative of causation, but it is not alone determinative."). Therefore, events prior to April 14, 2022, may still be used and referenced to contextualize and provide evidence for the alleged retaliatory event that is not time-barred such as Phillips' termination from BPD.

### 2.    Count II: First Amendment Retaliation Claim against Individual Defendants Nadeau and Harrison

Phillips alleges that the individual Defendants Nadeau and Harrison unlawfully retaliated against his protected speech by terminating him from BPD following a litany of reporting misconduct within BPD. (Compl. ¶¶ 85–86). Defendants argue that Phillips fails to state a claim for First Amendment retaliation, and that the individual Defendants are entitled to qualified immunity. (Mot. at 16 n.3). At this stage, the Court finds that Phillips sufficiently alleges a First Amendment retaliation claim against individual Defendants and that they are not entitled to qualified immunity.

The United States Court of Appeals for the Fourth Circuit applies a three-prong test to determine whether a public employee's First Amendment rights were violated under Section 1983, when the employee claims discipline resulted from their protected speech.[6]

---

[6] The Court notes that both parties erred in their briefing by citing to incorrect standards for First Amendment retaliation, as both parties generally relied on the

McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998); see also Traore v. Baltimore Police Dep't, No. MJM-22-793, 2023 WL 8600553, at *17 (D.Md. Dec. 12, 2023). To apply the McVey test, courts must determine the following: (1) whether the employee "was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest;" (2) whether the employee's interest in speaking freely outweighs "the government's interest in providing effective and efficient services to the public," known as the Pickering balancing test; and (3) whether the employee's speech caused the disciplinary action. McVey, 157 F.3d at 277–78. The first two prongs are questions of law, while the third is a factual inquiry. Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017) (citing Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012)). The Court will address each element in turn.

> ### a.  Phillips sufficiently alleges that he spoke as a citizen upon a matter of public concern rather than as an employee about a matter of personal interest.

There is a two-part inquiry to determine whether a public employee "was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." McVey, 157 F.3d at 277. The first inquiry asks if "the speech was made as a citizen or pursuant to the employee's duties." Crouse v. Town of Moncks Corner, 848 F.3d

---

Constantine factors for retaliation. (See Mot. at 10; Opp'n at 5); see also Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474 (4th Cir. 2005). The Constantine factors apply to suits for First Amendment retaliation by private citizens, however, the McVey test is the test that applies to suits for First Amendment retaliation by public employees. See McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998); Traore v. Baltimore Police Dep't, No. MJM-22-793, 2023 WL 8600553, at *17 (D.Md. Dec. 12, 2023).

at 583 (citing Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)). The second inquiry asks if "the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.'" Id. (citing Connick v. Myers, 461 U.S. 138, 149 (1983)).

### i.    Phillips made his speech as a citizen.

Speech made in the course of an employee's duties is generally not protected under the First Amendment. Courts have been instructed to "engage in a 'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those ordinary duties." Hunter v. Town of Mocksville, 789 F.3d 389, 397 (4th Cir. 2015) (citing Garcetti, 547 U.S. at 422, 424).

An analogous case is Andrew v. Clark, 561 F.3d 261 (4th Cir. 2009). There, a BPD commanding officer prepared a memorandum expressing concern and requesting further internal investigation after a police shooting. Id. at 264. Dissatisfied with BPD's lack of response, he released the memorandum to the Baltimore Sun "because of his concern for public safety." Id. at 264–65. After the Baltimore Sun published an article highlighting the concerns raised in the memorandum, the officer was subjected to an Internal Affairs investigation, and BPD soon terminated his employment. Id. at 265. On appeal after the district court granted BPD's motion to dismiss, the Fourth Circuit reversed. Id. at 264. The court reasoned that because the officer "was not under a duty to write the memorandum as part of his official responsibilities" and "would not have been derelict in his duties as a BPD commander [or] . . . suffered any employment consequences, had he not written the

memorandum," he did not write the memorandum in the course of his employment duties. Id. at 264–67.

Defendants claim that Hamilton v. Mayor & City Council of Baltimore, 807 F.Supp.2d 331 (D.Md. 2011) is on point. (Mot. at 12). There, a former police officer who lodged an internal complaint regarding overtime abuse alleged that she had been terminated in retaliation. Hamilton, 807 F.Supp.2d. at 337, 343. Finding that the officer did not make this internal complaint as a public citizen, Judge Hollander explained that BPD's policies "required plaintiff to report misconduct within the chain of command," and "[i]n doing so, plaintiff clearly [acted] pursuant to a duty imposed upon her as a BPD employee." Id. at 351. Defendants argue that because BPD policies in each case "contain[] reporting language that is nearly verbatim," Phillips' speech must also not be protected. (Mot. at 12–13).

What this argument fails to address is that regardless of whether Phillips had a general obligation to report misconduct within the department, he had no duty to report misconduct to MDH, the OIG, or the Baltimore Sun. Here, Phillips did not simply "report misconduct within the chain of command," (Hamilton, 807 F.Supp.2d. at 351) (emphasis added), but instead deviated from the chain of command altogether. Hamilton is therefore not entirely on point, but as will be discussed further, not all of Phillips' speech or reports could be considered to have been made as a private citizen because they were made within the chain of command.

The two reports Phillips made on March 14, 2019, are examples of this. Phillips had a duty to make his first in-person report to Laboratory Chief O'Dell and Director Jaeger

because it was in reference to a COMAR violation brought to his attention by one of his subordinates. (Compl. ¶ 38). The same day, and again in April 2020, he reported DellaRocco's "no more Afghan people" statement to O'Dell and then to the EEOC. (Id. ¶¶ 37, 54). The same is likely true for Phillips' March 14, 2021 report made to EODS in PIB, alleging race-based discrimination of subordinate personnel. (Id. ¶ 63). These examples of reports made "within the chain of command" are all examples of reports made within the course of Phillips' official duties as a supervisor in BPD's lab and therefore do not merit First Amendment protection, as found in Hamilton.

Phillips' reports outside of BPD, including the 75-page report to the Baltimore City Office of the Inspector General, Department of Human Resources, and higher-ups in BPD including Harrison, (id. ¶ 46), his letters to Baltimore Mayor Scott, (id. ¶ 77), and his contact with the Baltimore Sun, (id. ¶ 72), are all examples of speech made as a private citizen. All these examples go outside the chain of command within the BPD and thus were not made according to Phillips' official duties.[7] As in Andrew, Phillips here "would not have been derelict in his duties" if he had not written the OIG report or reported outside of BPD. See Andrew, 561 F.3d at 264.

### ii.    Phillips' speech addressed matters of public concern

Whether speech "addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147–48. "Speech involves a matter of public concern when it involves an issue

---

[7] Plaintiff's report to the Maryland Department of Health of a COMAR violation related to an unqualified person in the lab, (Compl. ¶ 40), could be decided either way.

of social, political, or other interest to a community." Kirby v. City of Elizabeth City, 388 F.3d 440, 446 (4th Cir. 2004). This inquiry is focused on "whether 'the public or the community is likely to be truly concerned with or interested in the particular expression.'" Id. (quoting Arvinger v. Mayor of Baltimore, 862 F.2d 75, 79 (4th Cir. 1988)). "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment." Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992).

There is a recognized "basic truth that speech by public employees undertaken in the course of their job duties will frequently involve matters of vital concern to the public, without giving those employees a First Amendment right to dictate to the state how they will do their jobs." Urofsky v. Gilmore, 216 F.3d 401, 407 (4th Cir. 2000) (en banc). Though the Fourth Circuit in Urofsky ultimately determined that the plaintiffs in that case were not entitled to First Amendment protection, the court imagined a hypothetical situation analogous to the present case that would merit protection, stating that if a public employee "writes a letter to the editor of the local newspaper to expose a pattern of prosecutorial malfeasance, the speech is entitled to constitutional protection because it is made in the employee's capacity as a private citizen and touches on matters of public concern." Id. at 408.

Further, when the speech at issue is a writing, it must be "considered in its entirety". Stroman, 981 F.2d at 157. It should be noted, however, that this "does not give [courts] license to ignore the portions of [a] letter raising issues of [public concern] simply because

most of [a] letter is devoted to personal grievances." Campbell v. Galloway, 483 F.3d 258,

267 (4th Cir. 2007); see also Connick, 461 U.S. at 149 (continuing analysis to interest-

balancing step when only "one of the questions in Myers' survey touched upon a matter of

public concern, and contributed to her discharge."); Stroman, 981 F.2d at 158 ("When

speech arguably relates to a matter of public concern, we prefer to apply the approach taken

in Connick and weigh whatever public interest commentary may be contained." (emphasis

added)).

Here, Phillips's seventy-five (75) page OIG report (ECF No. 1-10) must be viewed

in its entirety. The OIG report includes significant amounts of material that solely concern

complaints about conditions of employment, specifically Phillips' allegations of a hostile

work environment and retaliation. (See, e.g., OIG Report at 2 ("Director Dellarocco and

[D]irector Conway are using official processes in illegitimate ways as acts of retaliation[,]

[ . . . ] creating false narratives in a 'management by slander' effort against me[, and] [ . . . ]

setting goals that seemed designed to set me up fail.")). However, there are also many

references to issues that are matters of public concern. (See, e.g., id. at 74 ("[L]atent

fingerprint evidence [] is being written off in bulk, leading to potentially hundreds of

thousands of dollars of financial waste" and "the Director knowingly attempted to thwart

compliance with state regulations regarding the FSU Technical Lead's competency to

perform latent processing.")).

Speech related to the alleged financial waste of hundreds of thousands of dollars, a

backlog of cases not being investigated, and wrongdoing by government officials

constitutes speech that raises issues of public concern because it involves financial, legal,

and political interests of the community. See Kirby, 388 F.3d at 446. Thus, Phillips alleges sufficient facts to find that the content of his speech addressed matters of public concern. This determination is supported by the fact that the Baltimore Sun reported on the issue on more than one occasion, quoting Phillips multiple times, (Baltimore Sun Article at 3–5),[8] demonstrating that the public is "truly concerned with or interested in the particular expression." Kirby, 388 F.3d at 446 (quoting Arvinger, 862 F.2d at 79). On these facts, the Court finds Phillips' Complaint sufficient for the first prong of the McVey test because he adequately alleges that he spoke as a private citizen on a matter of public interest.

      **b.**    **Phillips' interest in speaking freely outweighs governmental interest in providing efficient services to the public**

After a court determines a plaintiff has adequately alleged that the speech at issue involved a matter of public concern, "it [becomes] the government's burden to 'clearly demonstrate' that the speech 'substantially interfered' with official responsibilities." Connick, 461 U.S. at 150. This is referred to as the Pickering balancing test and requires balancing "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). This test "demands a 'particularized' inquiry into the facts of a specific case." Crouse, 848 F.3d at 583 (citing Connick, 461 U.S. at 150).

---

    [8] The Baltimore Sun article attached to the Complaint (ECF No. 1-14) was published on August 16, 2021, but references another article published on August 11, 2021, (id. at 3).

The Fourth Circuit has recognized that "police departments are particularly vulnerable to the temptation to circle the wagons and 'wall themselves off from public scrutiny and debate.'" Crouse, 848 F.3d at 589 (quoting Liverman v. City of Petersburg, 844 F.3d 400, 413 (4th Cir. 2016)). It has been noted that "[w]hile 'the First Amendment allows the public to hold a police department accountable when the normal [internal] process fails,' 'the need for such incentives is far less compelling when a police department is not even given a chance to review or investigate an incident.'" Billioni v. Bryant, 998 F.3d 572, 578 (4th Cir. 2021) (Motz, J., concurring) (quoting Crouse, 848 F.3d at 589).

The situation here is distinguishable from that of most Fourth Circuit precedent. Here, Phillips made numerous attempts to report the alleged misconduct within governmental channels, including to MDH, Baltimore OIG, to PIB, and directly to his superiors. (Compl. ¶¶ 37–38, 40, 46–47, 54–55, 57). Even when he informed the BPD Media department and officials that he intended to go to the press, he allegedly only "indicated his intent to go to the media [to] report aspects of his [OIG/PIB complaint] that were of public concern," and "reviewed BPD Policy 602 to ensure that any disclosure he planned to make was permitted by the policy and limited to matters of public interest." (Id. ¶ 72) (emphasis added).

Phillips asserts that he attempted, numerous times, to give BPD the opportunity to review and investigate the alleged misconduct. (Id. ¶¶ 37–40, 46–47, 54–57). It was only after he "determined that nothing had been done" after "more than two years of raising alarms about the management of BPD's Forensic Science Division" that he decided to take any action that could erode public trust in BPD. (Id. ¶¶ 70–71). Accepting Phillips'

allegations as true, which this Court must, the Court finds that his claims satisfy the Pickering balancing test, at this stage of the litigation.

> ### c.    Phillips sufficiently alleges that his speech caused his termination

Turning to the third and final factor of the McVey test, the Court finds that Phillips sufficiently alleges that his speech caused his termination from BPD. When reviewing a First Amendment retaliation claim at the motion to dismiss stage, courts typically infer causation purely on the basis of the complaint's allegations because courts are unwilling to make generalized speculations. Lane v. Anderson, 660 F.App'x. 185, 193 (4th Cir. 2016) (quoting Tobey v. Jones, 706 F.3d 379, 391 (4th Cir. 2013)) (citation modified). Temporal proximity is important, as "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" Clarke v. Dyncorp Int'l LLC, 962 F.Supp.2d 781, 790 (D.Md. 2013) (quoting King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003)).

On June 30, 2021, Phillips informed BPD Media and senior officials including Defendants Nadeau and Harrison that he intended to go public with the information in his OIG Report. (Id. ¶ 72). Less than a month later, on July 21, 2021, BPD suspended Phillips pending termination due to administrative charges issued through PIB for the two complaints lodged against him. (Id. ¶ 73). After an allegedly improper PIB termination hearing on these charges, BPD terminated Phillips. (Id. ¶¶ 76, 78).

Defendants Harrison and Nadeau were both involved in Phillips' termination, as Nadeau recommended it and Harrison approved it. (Id. ¶ 78). Phillips copied Nadeau and Harrison on an email about his intent to go public with information about the BPD backlog

and were thus aware of Phillips' speech. (Id. ¶ 72). At this stage of litigation, the Court finds that Phillips pled sufficient factual allegations to infer causation. See, e.g., Lane, 660 F.App'x. at 191 (finding that this third prong is "best resolved on 'summary judgment only in those instances when there are no causal facts in dispute.'" (quoting Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004))). Because the Court finds that Phillips alleges each of the McVey factors, his First Amendment retaliation claim against Defendants will survive the Motion to Dismiss.

To avoid this result, individual Defendants argue that they are entitled to qualified immunity "because it was not clearly established that [Phillips'] speech . . . was a matter of public concern." (Mot. at 16–17 n.3). The Court disagrees.

"Qualified immunity protects public officials from suit when the state of the law is such that they would not have known that their conduct violates statutory or constitutional rights." Owens, 767 F.3d at 395 (4th Cir. 2014) (citing Ashcroft v. al-Kidd, 563 U.S. 731 (2011); Pinder v. Johnson, 54 F.3d 1169, 1177–78 (4th Cir. 1995) (en banc). This "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012).

To determine that a right was clearly established, the "right must be sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.'" Id. (quoting Ashcroft, 563 U.S. at 741 (2011)) (citation modified). Even if no prior decision addresses the conduct at issue, a right can be "clearly established" if "its illegality would have been evident to a reasonable officer." Rogers v. Pendleton, 249 F.3d

279, 285–86 (4th Cir. 2001). In <u>Garrett v. Clarke</u>, the Fourth Circuit decided that "defendants bear the burden of proving that the unlawfulness of their conduct was not clearly established." 74 F.4th 579, 584 (4th Cir. 2023).

"A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but . . . when asserted at this early stage in the proceedings, 'the defense faces a formidable hurdle' and 'is usually not successful.'" <u>Owens</u>, 767 F.3d at 396 (quoting <u>Field Day, LLC v. Cnty. of Suffolk</u>, 463 F.3d 167, 191–92 (2d Cir. 2006)). Defendants "must demonstrate that (1) a plaintiff has not alleged or shown facts that 'make out a violation of a constitutional right,' or that (2) 'the right at issue was not clearly established at the time of' its alleged violation." <u>Owens</u>, 767 F.3d at 395–96 (quoting <u>Pearson v. Callahan</u>, 555 U.S 223, 232 (2009)) (citation modified).

Here, the Court finds that the individual Defendants have not met their burden at this stage of the proceedings. For the first prong, as found above, Phillips sufficiently alleges a violation of his constitutional rights under the First Amendment. As to the second prong, Defendants concede that "[t]here is no doubt that at the time of [Phillips'] termination, the right of public employees not to be fired on a basis that infringes on their First Amendment rights was clearly established." (Mot. at 16 n.3). Defendants go on to state, however, that "[t]he question in this case, then, is whether a reasonable officer at BPD would have known that the rambling 75-page complaint Plaintiff submitted to PIB [in June 2020] . . . 'touched on a matter of public concern.'" (<u>Id.</u> at 16–17 n.3). Contrary to Defendants' claim, that is not the most relevant question in this case. The only actionable event of Phillips' alleged retaliation was the termination in April 2022. (<u>Id.</u> at 27). Phillips

was suspended pending such termination on July 21, 2021. Id. at 16. This suspension took place three weeks after he emailed the BPD Media Relations Team and officials at BPD, including the two individual Defendants, that he intended to go to the media on matters of "public concern." (Compl. ¶¶ 72–73). The relevant question here, then, is whether Phillips' termination was in retaliation for his stated intent to go to the press, and whether a reasonable BPD official would have understood that such action would violate a clearly established right.

The Court here finds that a reasonable BPD official in Nadeau or Harrison's position would have understood that firing an employee for stating his intention to go to the press to report misconduct would violate the First Amendment. Considering that BPD faced litigation for similar protected activity in the past, (see, e.g., Andrew v. Clark, 561 F.3d 261), this right is clearly established, especially to the two officials most responsible for instituting the Consent Decree and running the internal investigations bureau. Determining whether Phillips' suspension and subsequent termination was caused by his stated intention to go to the press requires discovery; therefore, the individual Defendants are not entitled to a grant of qualified immunity at this stage of litigation.

### 3.    Count I: Monell Claim against BPD

Defendants contend that Phillips fails to allege a Monell claim, arguing that his claims fail under any of the Monell theories of liability. (Mot. at 21). Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, deprives them "of any rights, privileges, or immunities secured by the Constitution and

laws" of the United States. See, e.g., Filarsky v. Delia, 566 U.S. 377, 383 (2012); Owens v. Balt. City State's Atty's Off., 767 F.3d 379, 402 (4th Cir. 2014).

There is no respondeat superior liability in Section 1983 claims, but in Monell, the Supreme Court held that local governmental entities may be liable under Section 1983 based on the unconstitutional actions of individual defendants where those defendants were executing an official policy or custom of the local government that violated the plaintiff's rights. Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690–91 (1978). The Monell Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . the government as an entity is responsible under § 1983." Id. at 694. An official policy "often refers to formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986). Such policy is "often but not always committed to writing." Id. at 480.

A viable Monell claim must allege that the municipality had an unconstitutional policy or custom; and the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. See, e.g., Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403–04 (1997); Kirby v. City of Elizabeth City, 388 F.3d 440, 451 (4th Cir. 2004). There are four kinds of customs, policies, or practices that a plaintiff can allege: (1) "the decisions of a government's lawmakers"; (2) "the acts of its policymaking officials"; (3) "practices so persistent and widespread as to practically have the force of law"; and (4)

"[a] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights." Connick v. Thompson, 563 U.S. 51, 61 (2011).

Alleging a Monell claim is far easier than prevailing on the merits. Owens, 767 F.3d at 403. "It is a rare plaintiff who will have access to the precise contours of a policy or custom prior to having engaged in discovery, and requiring a plaintiff to plead its existence in detail is likely to be no more than an exercise in educated guesswork." Green v. Obsu, ELH-19-2068, 2021 WL 165135, *15 (D.Md. Jan. 19, 2021) (quoting Estate of Osuna v. Cty. of Stanislaus, 392 F.Supp.2d 1162, 1174 (E.D. Cal. 2019)). "A plaintiff fails to state a claim only when he offers 'labels and conclusions' or formulaically recites the elements of his § 1983 cause of action." Owens, 767 F.3d at 403 (quoting Iqbal, 556 U.S. at 678).

To plead a Monell claim in the Fourth Circuit, "[t]here is no requirement that [a plaintiff] detail the facts underlying his claims, or that he plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." Jordan by Jordan v. Jackson, 15 F.3d 333, 339 (4th Cir. 1994). Instead, it is required that a plaintiff only satisfy "the usual requirements of notice pleading specified by the Federal Rules." Id. (quoting Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993)); see Vandermeer v. M/V CHARAZZ, No. 4:15-CV-153-D, 2017 WL 4248045, at *3 (E.D.N.C. Sept. 25, 2017) ("Notice pleading requires that a complaint put a defendant on notice of the claims against him."). A plaintiff need not "plead multiple instances of similar constitutional violations to support an allegation of municipal policy or custom." Jordan, 15 F.3d at 339; see also Ulloa v. Prince George's Cnty., DKC-15-0257, 2015 WL 7878956,

at *6 (D.Md. Dec. 4, 2015) (recognizing that a plaintiff "pair[ing] general averments of a policy or custom with particular examples" would support a finding of <u>Monell</u> liability).

Here, Phillips' allegations meet the notice pleading standard because he has provided a short and plain statement identifying BPD's retaliatory practices to a high degree. (Compl. ¶¶ 26–29, 85–86). According to Phillips, Nadeau used his position as the head of PIB, the BPD office responsible for internal investigations and discipline, to retaliate against employees who reported internal misconduct, with Harrison's endorsement. (<u>Id.</u> ¶¶ 85–86). He alleges that Nadeau "routinely interfered with and/or halted investigations and solicited, encouraged, and demanded acts of retaliation by his subordinates against individuals who reported misconduct." (<u>Id.</u>). To achieve this retaliatory end, he alleges that Nadeau "orders PIB investigators to tailor their investigations and recommend preordained findings that are consistent with his desired outcomes," (<u>id.</u> ¶ 26); "orders PIB investigators to evaluate cases at a standard below a preponderance of [the] evidence in order to reach his preordained recommendations," (<u>id.</u> ¶ 27); and "coerces and intimidates hearing officers assigned to the Office of Administrative Hearings ("OAH") to ensure that OAH recommends disciplining respondents consistent with his pre-determined desires," (<u>id.</u> ¶ 28). Phillips further alleges that Harrison "was aware of, and endorsed, [Defendant] Nadeau's tactics" in running PIB, as detailed above. (<u>Id.</u> ¶ 29). He alleges that Harrison was the final decisionmaker "as it relates to disciplining officers for findings made in PIB investigations," (<u>id.</u> ¶ 3), and "endorsed acts of retaliation by his subordinates against individuals who reported misconduct." (<u>Id.</u> ¶ 86). The Court finds this alleged policy, paired with specific allegations

of misconduct in Phillips' claim, sufficient for this early stage of litigation. See Jordan, 15 F.3d at 339; Ulloa, 2015 WL 7878956, at *6.

As will be discussed below, Phillips adequately alleges Monell liability based on theories of: (1) the decisions of policymaking officials; and (2) a persistent and widespread practice. (Opp. at 13–14); Connick, 563 U.S. at 61.

### a.    Actions and Decisions of Final Policymakers

To state a Monell claim based on the acts of policymaking officials, the plaintiff must allege that official actions of individuals with "final policymaking authority" caused the alleged deprivation of constitutional rights. Riddick v. Sch. Bd. of City of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000) (quoting Monell, 436 U.S. at 694). Only then may the official actions "fairly be said to represent official policy" of the municipality for the purposes of imposing Section 1983 Monell liability. Id. (quoting Monell, 436 U.S. at 694). Further, the acts must be "certain affirmative decisions of individual policymaking officials." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483–84 (1986)).

Additionally, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Pembaur, 475 U.S. at 480. Indeed, a "governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances," so long as that unit possessed "final authority to create official policy." Semple v. City of Moundsville, 195 F.3d 708, 712 (4th Cir. 1999) (citing Pembaur, 475 U.S. at 481). Accordingly, in assessing whether a municipality may be held liable for the constitutional or statutory violations of

their decisionmakers, the touchstone inquiry is whether "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Liverman v. City of Petersburg, 844 F.3d 400, 413 (4th Cir. 2016) (quoting Pembaur, 475 U.S. at 481). If so, the decisionmaker's actions may fairly be attributed as reflecting municipal policy. See Pembaur, 475 U.S. at 481.

Phillips' allegations that Nadeau orders PIB investigators to perform their jobs in certain ways with Harrison's approval, consistent with their positions as the Commissioner and Deputy Commissioner with oversight of PIB, support a finding of Monell liability. See generally, Pembaur, 475 U.S. at 485 (recognizing that a County Prosecutor was a policymaking official when he "was acting as the final decisionmaker for the county" by instructing them to enter a hospital room). As the two highest officials within BPD's PIB, Nadeau and Harrison are precisely the "final decisionmakers" described in Pembaur. (Compl. ¶¶ 7–8 ("In his capacity as Police Commissioner, Defendant Harrison oversaw all aspects of BPD including its efforts to comply with the Consent Decree;" Defendant Nadeau "was a Deputy Commissioner of BPD and responsible for the reform and oversight of PIB.")). Phillips alleges that Harrison and Nadeau ordered PIB investigators to retaliate against employees who report misconduct, by improperly conducting investigations to reach pre-determined findings and outcomes in disciplinary proceedings. (Compl. ¶¶ 3, 25–28, 85–86). These claims allege specific misconduct by the individual Defendants that clearly violate statutory and constitutional rights and further demonstrate that they possess final authority to establish municipal policy.

b.    **Persistent and Widespread Practice**

Phillips also asserts that BPD engaged in a persistent and widespread practice of retaliating against individuals who report misconduct within the department. (Opp'n at 13–14). Without an express policy, a party pursuing a <u>Monell</u> claim may "point to a 'persistent and widespread practice,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct[;] and (2) failed to correct it due to their 'deliberate indifference.'" <u>Owens</u>, 767 F.3d at 402 (citing <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1386–91 (4th Cir. 1987)). "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." <u>Id.</u> at 402–03 (citing <u>Spell</u>, 824 F.2d at 1391); <u>see also</u> <u>Ulloa</u>, 2015 WL 7878956, at *6 (D.Md. Dec. 4, 2015) (recognizing that a plaintiff's allegations may "suggest that discovery could provide any evidence of 'deliberate indifference' on the part of the [municipality].").

Here, Phillips points to a report from the Commission to Restore Trust in Policing,[9] among other things, to show BPD's persistent and widespread practice of retaliation. (<u>See</u> Compl. ¶¶ 23, 40–58).[10] The report detailed that about 56% of BPD officers who reported

---

[9] The report provides findings from a survey of active members of BPD, conducted over one month, from August 11, 2020, through September 10, 2020, three years after the 2017 implementation of the Consent Decree. (Compl. ¶ 23).

[10] Ordinarily, a court may not consider extrinsic evidence when resolving a Rule 12(b)(6) motion. <u>See</u> <u>Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC</u>, 794 F.Supp.2d 602, 611 (D.Md. 2011). But this general rule is subject to several exceptions, such as the documents attached to the complaint, <u>see</u> Fed.R.Civ.P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic, <u>see</u> <u>Blankenship v. Manchin</u>, 471 F.3d 523, 526 n.1 (4th Cir. 2006) (quoting <u>Ridpath v. Bd. of Governors Marshall Univ.</u>, 447 F.3d 292, 306 (4th Cir. 2006)). Here, the survey results were attached to the complaint to support the policy that Phillips alleges, a

misconduct felt that they suffered consequences for their report. (<u>Id.</u> ¶ 23). The report also stated that the "overwhelming majority of survey respondents said they would report corruption if they observed in the future, but many added that they would feel uncomfortable doing so unless they could report anonymously, out of fear that they would otherwise be subjected to retaliation or labeled a 'rat' or a 'snitch.'" (<u>Id.</u>). Reports of corruption may not always be protected under the First Amendment, but the fact that many survey respondents stated that they would fear retaliation for such reports supports an inference that retaliation against BPD employees who reported misconduct was a widespread practice within BPD.

Additionally, Phillips' allegations regarding his own experience at BPD supports a finding of persistent retaliation within the department. Specifically, he alleges that in April 2019 he reported an alleged COMAR violation to MDH and was subject to an uncomfortable work environment and received negative employment reviews, all within a month's time. (Compl. ¶¶ 40–45). In January and June of 2020, Phillips filed his 75-page report, first with Baltimore OIG and then with BPD's PIB. (<u>Id.</u> ¶¶ 46–47, 55). Phillips alleges that the PIB officer who received the report in June leaked the report to DellaRocco,

---

necessary element of his allegations, and Defendants have not disputed its authenticity, only its relevance. (Mot. at 28). Defendants' reliance on <u>Simmons</u> is misplaced—there, the policy being challenged was one that was "in fact implemented to comply with the Consent Decree," rather than simply existing at the same time. <u>Simmons v. Balimore City Police Dep't</u>, No. RDB-21-969, 2021 WL 3418840, *10 (D.Md. Aug. 5, 2021).

and that six days after he filed this report with PIB, she filed a retaliatory PIB complaint against him for contra-power harassment. (Id. ¶¶ 56–58).[11]

Additionally, on April 11, 2021, Phillips contacted Baltimore Mayor Scott about the concerns he raised in his OIG Complaint, stating that "'[he] believe[s] citizens' right to know about serious mismanagement and waste of public funds outweighs any supposed interest the BPD may have in keeping these matters confidential.'" (Baltimore Sun Article at 5, ECF No. 1-14).[12] Within a couple of weeks, Phillips supervisor summoned him again and DellaRocco informed him of a new PIB complaint, a complaint which he alleged to be baseless and retaliatory. (Compl. ¶¶ 64–65). Phillips' allegation that his own PIB complaint was never investigated, while the allegedly retaliatory PIB complaints filed against him by other BPD officials were immediately investigated, (id. ¶ 70), and that all complainants who lodged the retaliatory PIB complaints and corroborated those reports at the termination hearing have since been promoted, (id. ¶ 80), suggests a widespread policy of retaliation. Because Phillips alleges a series of specific instances of retaliation over a significant period, this Court may infer that BPD's policymakers had actual or constructive knowledge of the retaliatory practices within BPD yet were deliberately indifferent to such practices. See Owens, 767 F.3d at 402–03. Accordingly, the Court finds that Phillips' Monell claim against BPD (Count I) survives Defendants' Motion to Dismiss.

---

[11] Though Phillips is time-barred from pursuing these and other claims, they are still relevant in demonstrating the widespread nature of the retaliatory policy that Phillips alleges within BPD, revolving around PIB. See Hisp. Nat'l L. Enf't Ass'n NCR, No. TDC-18-3821, 2019 WL 2929025, at *9 (D.Md. July 8, 2019).

[12] This event was not alleged in the Complaint but was detailed in the Baltimore Sun Article (ECF No. 1-14) attached to the Complaint.

## III.    CONCLUSION

For the reasons stated herein, the Court grants in part and denies in part Defendants' Baltimore Police Department, Michael Harrison, Brian Nadeau, and Rana DellaRocco's Motion to Dismiss (ECF No. 18). The Court grants dismissal of all claims against Defendant DellaRocco; grants dismissal of all claims under Count III (conspiracy under 42 U.S.C. § 1985); and grants dismissal of all claims related to constitutional violations under the Fourteenth Amendment, as these claims have all been conceded by Phillips. The Court denies dismissal of Phillips' First Amendment retaliation <u>Monell</u> claim (Count I) against Baltimore Police Department; and denies dismissal of Phillips' First Amendment retaliation claim (Count II) as it relates to Defendants Harrison and Nadeau. A separate Order follows.

Entered this 28th day of January, 2026,

                                                             _____/s/_____

                                                             George L. Russell, III
                                                             United States District Judge